[Cite as *State v. Gervin*, 2016-Ohio-8399.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO. 9-15-52

    v.

ROBERT GERVIN AKA                 O P I N I O N
GREGORY GERVIN,

    DEFENDANT-APPELLANT.

---

**Appeal from Marion County Common Pleas Court**
**Trial Court No. 15-CR-252**

**Judgment Affirmed**

**Date of Decision: December 27, 2016**

---

APPEARANCES:

    *Robert C. Nemo* for Appellant

    *Kevin P. Collins* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Robert Gervin, appeals the judgment of the Court of Common Pleas of Marion County convicting him of one count of improperly discharging a firearm at or into a habitation with a specification, two counts of aggravated arson, and one count of felonious assault with a specification and sentencing him to a total of 18 years in prison. On appeal, Gervin argues that the trial court erred by depriving him of his constitutional right to a fair trial and an appropriate sentence and entering convictions that were against the manifest weight of the evidence. Gervin also argues that he was denied effective assistance of counsel. For the reasons that follow, we affirm the judgment of the trial court.

{¶2} On June 19, 2015, the Marion County Grand Jury returned a nine-count indictment against Gervin, charging him with six counts of felonious assault with a firearm specification in violation of R.C. 2903.11(A)(2), 2929.14(D), and 2941.145, all felonies of the second degree; one count of improperly discharging a firearm at or into a habitation with a firearm specification in violation of R.C. 2923.161(A), 2929.14(D), and 2941.145, a felony of the second degree; and two counts of aggravated arson in violation of R.C. 2909.02(A)(1), both felonies of the first degree. Gervin entered pleas of not guilty to all charges.

{¶3} On July 16, 2015, the Marion County Grand Jury returned a "Superceding Joint Indictment" against Gervin and Cordarius Jones, charging each

co-defendant with two counts of improperly discharging a firearm at or into a habitation with a firearm specification in violation of R.C. 2923.161(A), 2929.14(D), and 2941.145, both felonies of the second degree; two counts of aggravated arson in violation of R.C. 2909.02(A)(1), felonies of the first degree; two counts of aggravated arson in violation of R.C. 2909.02(A)(2), felonies of the second degree; and three counts of felonious assault with a firearm specification in violation of R.C. 2903.11(A)(2), 2929.14(D), and 2941.145, all felonies of the second degree. Gervin entered pleas of not guilty to all charges.

{¶4} On October 21, 2015, Gervin filed a motion to sever his case from Jones's case.[1]

{¶5} The matter proceeded to jury trial, which took place from November 3 through November 6, 2015. Prior to voir dire, and outside the presence of the potential jury, both parties and the trial court discussed a newspaper article regarding Jones's case. The article included that Jones pleaded guilty to certain charges. The court acknowledged the potential problem that this could cause with the jury and stated, "it's gonna be appropriate to inquire of the jury whose [sic] read the paper this morning, which I assume counsel would do. If it's necessary to question any jurors outside the presence of the other jurors, you know, on those issues, that's fine, we can do that." Trial Tr., p. 12.

---

[1] Although no formal decision was ever filed by the trial court, we note that the trial consisted of only charges filed against Gervin.

-3-

{¶6} During voir dire, the trial court told the potential jury that charges against Jones would be addressed in a separate hearing and that this trial was solely for the purpose of determining Gervin's charges. Later, one of the potential jurors said "I do have a problem with the Defendant's supposed accomplice plead guilty - -[.]" *Id.* at p. 42. The trial court immediately informed the potential jury to disregard the comment. The juror continued, "I read the paper, Your Honor." *Id.* at p. 43. The court then proceeded to explain to the potential jury why they should disregard anything they read in the newspaper about this case. A couple of other potential jurors indicated that they had seen the article in the newspaper as well. The outspoken juror indicated that he was on the fence of whether he could remain impartial, but was later dismissed from serving due to a medical condition.

{¶7} Virginia Dawson was the first witness to testify on behalf of the State. Dawson testified that she and her husband, William Dawson ("William"), lived at 412 East Farming Street in Marion, Ohio. She stated that during the early morning hours of May 31, 2015, she was awoken by the sound of glass breaking in her bedroom. She explained that she saw something repeatedly hit the glass window until it broke. She continued that after the glass broke, she noticed a fire on the window sill. She added that the fire was contained to the outside portion of the window because the storm window was in the up position, which blocked the blaze from igniting the curtain and other parts of the inside.

**{¶8}** Dawson testified that she screamed and pulled William out of bed. She admitted that she did not hear any gunshots. She stated that William pushed her off the bed and she remained on the floor until she was able to call for help while William put out the fire. At this time, the State played the 9-1-1 call placed by Dawson for the jury, which was later admitted into evidence. Dawson identified several photographs of her home, which showed the damage caused by the fire. During this time, the prosecutor began to project the photographs on a screen so the jury could view the photos, which prompted the court to interrupt and state "First of all, is there any objection to those - - is there any objection to him displaying the photographs at this point?" *Id.* at p. 95. Counsel for Gervin did not object.

**{¶9}** Dawson also identified a photograph of her house that showed bullet holes, which she stated were not there prior to May 31, 2015. She stated that one of the bullets was found lodged in her refrigerator, which was later removed by the fire department. Dawson testified that two bullet holes were found in her bed. She explained that after investigators had left her house she found a bullet in her comforter. She added that she contacted the police and someone came out to pick up the bullet.

**{¶10}** On cross-examination, Dawson admitted that she was Anna Harris's ("Anna") grandmother. She testified that Anna was in town that weekend, but was not at the house when this occurred. Dawson stated that the fire was caused by

something that was thrown through the window by someone wearing a white hoodie, which she believed was called a Molly cocktail. She explained that she could not tell if the individual was a man or a woman or if the individual was white or black.

{¶11} William was the next witness to testify on behalf of the State.[2] William testified that he was awakened around 6:00 am on May 31, 2015 by his wife who was screaming about a fire in the room. He stated that he looked and saw the fire, then he heard a couple of gunshots. He added that he eventually got up and grabbed a fire extinguisher and proceeded to put out the fire. William estimated that the damage caused by the fire exceeded $1,000.

{¶12} On cross-examination, William clarified that he awoke to the sound of his wife screaming, saw the fire, and then heard three gunshots. He also admitted that he did not see the person who threw the Molotov cocktail. He testified that he did not know Gervin and had not seen him before the day of trial.

{¶13} After cross-examination, the court asked a series of questions, which William answered. The court also asked a series of questions that were suggested by the jury. In response to this line of questioning, William testified that the gunshots occurred within approximately 10 seconds of one another.

---

[2] William was asked by the prosecutor to identify and testify as to several of the same photographs that his wife had testified to, and therefore we have chosen to omit those portions of his testimony.

**{¶14}** Officer Steven Luoma of the Marion City Police Department was the next witness to testify. Officer Luoma testified that he was a patrol officer with the department and was working third shift on May 31, 2015. He stated that he was dispatched to 412 East Farming Street in Marion at 6:13 a.m. in response to a shots fired call. At the scene, Officer Luoma testified that he spoke with Anna and she told him that the suspect was a black male wearing a white hoodie. At this time, the court interrupted, and the following exchange occurred between the trial court and defense counsel:

> Court: Let's - - is there any concern about - -
>
> Counsel: I was gonna see where that was going.
>
> Court: I don't know where it's going. I'm just - - if there's no objection he can proceed.
>
> Counsel: Well, I'll just go ahead and let him continue and then - -
>
> Court: Okay.
>
> Prosecutor: I'll withdraw that portion of the question for now, Judge.

*Id.* at p. 133-134.

**{¶15}** Officer Luoma testified that he entered the home, which was still covered in smoke, and found the Molotov cocktail in the bedroom window. He described it as "an oil can with white rag that was hanging out of it." *Id.* at p. 135.

He stated that he and another officer went outside and located three bullet casings near to each other.

{¶16} One by one, Officer Luoma authenticated and identified several photographs of the scene that he took the day of the fire. Each photograph was published for the jury as Officer Luoma described their contents. In one of the photographs, Officer Luoma explained that the oil container was wrapped in red tape.

{¶17} Officer Luoma identified the Molotov cocktail, which he retrieved from the window. It was later admitted into evidence. He added that the container appeared to be a Formula motor oil container, which was black with a green label. He concluded by stating that the wick was attached to the container by red tape.

{¶18} On cross-examination, Officer Luoma testified that the contents of the container had spilled out and appeared to contain gasoline. Officer Luoma explained that after he collected any evidence in this case he cataloged it and placed it in a secure evidence locker at the police department.

{¶19} After cross-examination, the court asked Officer Luoma a series of questions that were suggested by the jury.

{¶20} Lieutenant James Fitsko of the Marion Police Department was the next witness to testify. Lieutenant Fitsko testified that he was working third shift on May 31, 2015 and was dispatched to 412 East Farming Street early that next morning.

He stated that he and Officer Luoma located and collected the three shell casings in the yard. He added that he collected a bullet from the refrigerator and a bullet that was located in the bedroom. He explained that he did not locate the bullet in the bedroom, but came back to collect it after Dawson found it. He testified about the chain of custody of the shell casings and other pieces of evidence. Lieutenant Fitsko stated that the Molotov cocktail was still smoldering when he arrived at the property.

{¶21} After a brief cross-examination and re-direct-examination, the court asked a series of questions to Lieutenant Fitsko that were suggested by the jury.

{¶22} Joel Thompson was the next witness to testify on behalf of the State. Thompson testified that he lived at 289 Maple Street and was living there on May 31, 2015. On that morning, Thompson stated that he was alerted by his nephews that there was a fire in the house. He added that he and his girlfriend were able to put the fire out, but there was still a lot of smoke in the house. Thompson described what he thought was a bomb that was the source of the fire. Thompson identified several photographs of his house, which were later admitted into evidence. The photographs showed the damage caused by the fire, including a broken window through which the bomb was thrown. He admitted that he did not know Gervin.

{¶23} On cross-examination, Thompson stated that there was damage to the kitchen, which required the refrigerator to be replaced along with the floor, and the walls needed to be repainted.

{¶24} Jasmine Floyd was the next witness to testify. Floyd testified that she lived at 291 Maple Street in Marion, which is half of a duplex (the other half, 289 Maple, was occupied by Thompson), and lived there on May 31, 2015. Floyd stated that she was awakened that morning by Thompson's girlfriend, Geneva Lee. She explained that she was unaware of the fire in the other half of the duplex until Lee came over to her half of the duplex. She added that there were bullet holes in her wall. Floyd identified several photographs of her home depicting the damage, which were later admitted into evidence. Floyd testified that she did not know either Gervin or Jones.

{¶25} Officer Richard Wheeler of the Marion City Police Department was the next witness to testify on behalf of the State. Officer Wheeler testified that he was working third shift on May 31, 2015 and was dispatched to 412 East Farming Street in Marion at approximately 6:00 a.m. After being on the scene for a few minutes, Officer Wheeler stated that he was dispatched to a possible shooting at 289 Maple Street.

{¶26} When he arrived at 289 Maple Street, Officer Wheeler found that there was smoke inside the home and located what appeared to be a homemade Molotov cocktail in the kitchen. He also located a brick or cinder block on the floor as well. Officer Wheeler explained that he located the entry point of the Molotov cocktail, which was a broken window. After walking the scene, Officer Wheeler testified

that he took down several witness statements and accompanied Lieutenant Fitsko who took photographs of the scene. He identified each photograph, which were later admitted into evidence.

{¶27} As the prosecutor was having Officer Wheeler identify each photograph one at a time, the court interjected,

> The testimony would be a lot easier for the jury if you just give 'em all the photographs, ask him if all the ones you're gonna use, as [sic] him if they're a fair and accurate representation of what the scene appeared on that day, then you've laid your foundation, we can display the photograph as he's explaining the photograph instead of having the prior photograph displayed while he's explaining the next photograph. It would move quicker and I think it would be more understandable for the jury.

*Id.* at p. 228. The prosecutor did as he was told and every photograph was collectively identified by Officer Wheeler.

{¶28} One of the photographs depicted the Molotov cocktail, which Officer Wheeler described as "the suspected Molotov cocktail, you got the red tape around it, the oil jug, and then the rag." *Id.* at p. 233. Officer Wheeler also identified a shell casing, which he collected at the scene. He then explained how the chain of custody was conducted on the casing.

{¶29} On cross-examination, Officer Wheeler admitted that when he was initially dispatched that the suspect was one black male wearing a white shirt.

{¶30} After cross-examination, the trial court questioned Officer Wheeler and also asked a series of questions that were suggested by the jury.

{¶31} Victor Wilson was the next witness to testify. Wilson testified that he lived with Floyd at 291 Maple Street on May 31, 2015. He stated that his two children as well as two of hers lived with the couple. He added that the children were home during the shooting.

{¶32} Phillip Pickett was the next witness to testify on behalf of the State. Pickett testified that he lived at 327 Silver Street in Marion and did so on May 31, 2015. Pickett stated that he returned from work early in the morning, sat down in the living room, and heard two to three gunshots. He explained that he ran upstairs and looked out a window and saw two black males running across his neighbor's yard. Pickett added that he went outside and saw a white Neon take off from the scene.

{¶33} Pickett explained that his house was around the corner from Maple Street and that he could see 289/291 Maple Street from his house. He concluded by telling the jury that he told his fiancée to call 9-1-1 and ran over to the fire and told everyone to get out of the house.

{¶34} On cross-examination, Pickett explained that he lost sight of the males when he ran out of the house, but then saw the white Neon take off down the street. He clarified that he was able to determine the skin color of the individuals because they had their white shirts over their heads, which exposed their bare skin.

**{¶35}** After cross-examination concluded, the trial court asked Pickett a series of questions. The court also asked Pickett a series of questions suggested by the jury. Pickett added that he could not see any of the occupants of the white Neon.

**{¶36}** Lieutenant Darren Neuenschwander of the Marion City Fire Department was the next witness to testify. Lieutenant Neuenschwander testified that he was working on May 31, 2015 and received a call to go to 412 East Farming Street. When he arrived, he stated that police were at the scene conducting their investigation. After checking out the scene and observing the Molotov cocktail, Lieutenant Neuenschwander testified that he was dispatched to another fire call on Maple Street.

**{¶37}** Once at Maple, he stated that Captain Fetter and he walked to the rear of the building and found an oil container with red duct tape and white cloth, which appeared similar to the Molotov cocktail found at 412 East Farming Street.

**{¶38}** Lieutenant Neuenschwander testified that he was primarily responsible for the control and investigation of 412 East Farming Street while Captain Fetter handled the Maple Street fire. He explained that he took several photographs of the scene at 412 East Farming Street, which he later identified. They were ultimately admitted into evidence. He also identified several photographs he took at the Certified Gas Station on East Center Street in Marion ("Certified"). As he began to testify, the court interrupted, "I think we're gonna tread into hearsay on

that question. I don't think it's material why. I think he can testify what he did there." *Id.* at p. 277. Lieutenant Neuenschwander began to answer one of the prosecutor's questions, when the court interrupted again, "The question was what did you do there. Not what information you obtained." *Id.*

{¶39} Lieutenant Neuenschwander stated that they obtained a control sample of gasoline from the gas station so that they could compare it to the sample found at the crime scene. He also indicated that he took photographs of the display stand where oil containers identical to those found at the crime scenes were sold. These photographs were admitted into evidence. He explained that it was important that there were two oil containers used in the crimes and that the photograph showed two oil containers missing. He testified that he got samples from the oil container found at the East Farming Street. He explained that he placed the different samples in evidence containers and mailed them to the State Fire Marshal's Office for testing. He went on to explain the process by which they transport the evidence to the Fire Marshal's Office.

{¶40} He identified exhibits, which were the samples taken from the gas station and the oil container found at 412 East Farming Street. Both samples contained the proper chain of evidence markings from each department that handled the evidence.

{¶41} The court proceeded to ask a brief series of questions at the conclusion of Lieutenant Neuenschwander's testimony.

{¶42} Captain Adam Fetter of the Marion Fire Department was the next witness to testify on behalf of the State. Captain Fetter testified that he was working on May 31, 2015 when he was dispatched to Maple Street for a possible fire. He was also informed of a possible shooting in the area and was advised to be cautious. He explained that he examined the scene of the fire and found what appeared to be a homemade Molotov cocktail in the kitchen. He identified several photographs he took while at the Maple Street address, which were later admitted into evidence.

{¶43} Captain Fetter explained that he collected several pieces of evidence from the crime scene, including the Molotov cocktail, the wick from the Molotov cocktail, a liquid substance removed from the oil container, and a liquid substance that was located on the kitchen floor. While explaining his office's procedure on shipping evidence to the Fire Marshal's Office, Captain Fetter stated that after the evidence is properly secured they ship the evidence via a company, the Door Guys.

{¶44} Captain Fetter identified the actual Molotov cocktail obtained from the Maple Street address and the chain of custody markings. He did the same thing with the wicking fabric and the liquid substances from the oil container found at Maple Street and the kitchen floor. The exhibits were later admitted into evidence. While discussing these exhibits, the court interjected, "Did [Captain Fetter] cover State's

Exhibit 23 also? * * * So it's not different than what it's labeled on the list." *Id.* at p. 302.

**{¶45}** Captain Fetter was asked specifically about whether he broke the seal of the evidence bags containing the liquid samples taken from both 412 East Farming Street and Certified prior to trial, and Captain Fetter answered in the affirmative because he wanted to verify the bag's contents.

**{¶46}** On cross-examination, Captain Fetter estimated that the damage at 289 Maple Street was a couple thousand dollars. He clarified that he was asked to verify the contents of the evidence bag, containing the East Farming and gas station samples, prior to trial at the prosecutor's office.

**{¶47}** Christa Rajendram was the next witness to testify on behalf of the State. Rajendram testified that she worked for the State Fire Marshal's Office in the forensic laboratory and about her education and experience in her field. Specifically, Rajendram stated that she extracts and analyzes fire debris for any flammable liquid and can determine the contents of that liquid by performing a chemical analysis.

**{¶48}** In regard to this case, Rajendram received two cases: one that contained two liquids in two separate bottles from 412 East Farming and Certified; and one that contained an oil container, a piece of fabric, and some liquid samples from 289 Maple and Certified. Rajendram explained the procedure for marking the

chain of custody and testified that it appeared in order. When Rajendram began to testify about what tests she performed, the court interrupted and said

> Can we - - we don't have any testimony, first of all, you know - - you have an expert opinion, you don't have any testimony as to what it is she was examining that relates to this case, just two items, six items. Can we tie this to exhibits? Also get her qualified, make sure we're in agreement on that?

*Id.* at p. 313. Rajendram testified that she served as an expert witness in Ohio regarding ignitable fluids and liquids. She was then accepted as an expert witness in the field of analyzing ignitable fluids. The defense did not object.

{¶49} In the middle of direct-examination, the court interrupted again, stating "Okay. Let's - - you've identified items 1, 2, 3, 4, 5, and 6. Can you identify them by exhibit number so that the record's clear? * * * Let's have the witness testify about this." *Id.* at p. 316. The court also had Rajendram clarify which State's exhibits corresponded to her submission forms.

{¶50} Rajendram testified that she performed a chemical analysis on each exhibit. After explaining the scientific procedure behind the testing, Rajendram explained that the results of the tests revealed that the liquid sample taken from 412 East Farming consisted of a petroleum based oil. Further, the sample taken from the gas station consisted of gasoline. Regarding the samples taken from 289 Maple Street, the liquid samples, oil container, and wicking fabric contained gasoline and petroleum based oil. She added that the tests performed on the liquid samples taken

from Certified revealed the substance was gasoline. Rajendram was further able to determine that the gasoline found in the oil container taken from 289 Maple Street and the gasoline taken from Certified contained similar products. She explained that the composition of gasoline varies depending on the refinery or how the gasoline was blended. Rajendram confirmed that all of her conclusions were based on a reasonable degree of scientific certainty.

{¶51} On cross-examination, Rajendram explained the scientific process by which she compares gasoline samples to determine if they are likely from the same source in greater detail. She added that she was unable to compare the sample taken from the kitchen floor at 289 Maple Street because the volatile portion had evaporated.

{¶52} At the conclusion of cross-examination, the court asked Rajendram a series of questions. Specifically, the court asked Rajendram about her submission sheets, whether they were kept in the ordinary course of business at the State Fire Marshal's Office, whether they were relied upon in the operation of that business, whether she relied upon those documents, whether they were prepared by someone at or near the time of the events reflected upon in the document, and whether the sheets were routine. She answered yes to each question. The court also asked Rajendram if the conclusions in her reports were reached to a reasonable degree of

scientific certainty, which she stated they were. Then, the court continued its lengthy examination of Rajendram.

**{¶53}** Misty Cabanas was the next witness to testify on behalf of the State. Cabanas testified that she worked at Certified and served as an assistant manager. Cabanas stated that there are several security cameras that cover the store and that the feeds are recorded onto their system. Cabanas identified security footage from the early morning hours of May 31, 2015. The footage was played for the jury and, ultimately, admitted into evidence. Cabanas described what was occurring in the video while it played. At approximately 5:26 a.m., a white vehicle pulled into Certified. A black male exited the car and entered the store a few moments later. While the man was in the store, he walked around to the back where the automotive section was located, including motor oil. The man eventually purchased some oil, then exited the store and got back into the white car. Soon after, the vehicle pulled out, went to a pump, and the same man re-entered the store to purchase gasoline. He proceeded to leave the store again and returned to his car only to re-enter the store a third time and purchase a bottle of water. As he exited, the video showed that he was pouring the water out of the bottle as he was walking.

**{¶54}** On cross-examination, Cabanas stated that she had never seen Gervin before and was not working when the video was taken.

{¶55} Lori Hummel was the next witness to testify. Hummel testified that she worked at Certified as a cashier and was working on May 31, 2015. She recalled that on that morning a black man walked into the store on three separate occasions. First, the man purchased two quarts of oil. Second, the man purchased $10 of gasoline. Third, the man purchased a bottle of water. Hummel identified copies of receipts that showed the man's purchases, which were later admitted into evidence after the foundation for business records was laid.

{¶56} On cross-examination, Hummel believed she could possibly recognize the black man if she saw him again, but stated that the man was not Gervin. She added that she had never seen Gervin before.

{¶57} Billie Hawkins was the next witness to testify. Hawkins testified that she lived with Pickett at 237 Silver Street and that she was there on May 31, 2015. She explained that on that morning Pickett had just come home from work and the two heard two to three gunshots. Hawkins stated that she looked out the door and saw two black males running from the scene. She described the men as one being taller and the other shorter. One of the men was wearing a white t-shirt up over his head, which allowed Hawkins to see his skin color. She testified that she eventually called 9-1-1. She identified the audio recording of the call, which was played for the jury and later admitted into evidence.

{¶58} On cross-examination, Hawkins stated that she saw a four-door, white Neon with a spoiler on the back take off from the scene. She explained that she could not see who was driving the car, but did see the two men enter the car.

{¶59} Anna was the next witness to testify on behalf of the State. Anna stated that she lived in Columbus, but has stayed at 412 East Farming Street, which is her grandparents' house, in the past. Anna testified that she remembered her grandparents' house had a fire, but could not remember the exact date. She stated that she was in Marion that weekend.

{¶60} Anna testified that the night before the fire she had gotten into an argument with Sabreena Brown, who she had known for some time. She stated that she went to Bottom's Up in Marion on May 30, 2015. She claimed that she never saw Brown at Bottom's Up and that no altercation occurred between the two of them in the bar's parking lot. She also denied spitting in Brown's face.

{¶61} After leaving Bottom's Up, Anna testified that she and some friends went to a party located at a house on Pearl Street in Marion. She stated that she saw Brown at the party and the two of them got into a physical altercation. She explained that other people got involved in the fight and that a man had hit her during the fight. She identified Gervin as the man that hit her, but she did not know of his name at the time of the fight. She testified that she learned that Gervin was trying to help Brown because Anna was winning the fight.

{¶62} Anna stated that Brown had a white Neon car with a Georgia license plate. She added that she saw the car that night at the Bottom's Up. After leaving the party, Anna said she and her friends went to one of their houses. She explained that she remained there until her mother called her about the fire. Anna testified that she arrived at her grandparents' house and told a police officer to look for Brown's car as she felt Brown had something to do with the crime.

{¶63} Anna admitted that she was convicted of robbery and was currently on probation from that conviction.

{¶64} At the conclusion of Anna's testimony, the court asked a series of questions that were suggested by the jury. In answering one of the questions, Anna stated that the fight occurred because Brown was running her mouth about Anna and that Brown had dumped her drink on Anna.

{¶65} Officer Jamie Ralston of the Marion Police Department was the next witness to testify on behalf of the State. Officer Ralston testified that he was working on the night of May 30 and the morning of May 31, 2015. He stated that he was positioned outside of the Bottom's Up at approximately 2:30 a.m. He explained that he was positioned there to help decrease the likelihood of any problems with the patrons leaving the bar.

{¶66} During his time outside of the bar, there was a small altercation so Officer Ralston took down some license plates of the cars nearby as a precaution. One of the cars was a small white car with a Georgia license plate.

{¶67} On cross-examination, Officer Ralston clarified that he was unaware if the white car with the Georgia plate was one of the vehicles involved in the altercation.

{¶68} Zoie Clark was the next witness to testify. Clark testified that she knew several individuals involved in this case. Specifically, she knew Anna, Brown, Gervin, Jones, and B.M., a minor. She stated that Jones was also known as "Coco" and Gervin was also known as "Buddha." She testified that she lived on Pearl Street on May 30 and May 31, 2015. She added that Jones stayed with her at that address some times.

{¶69} Clark then began to describe the series of events that occurred on May 30 and May 31, 2015. According to Clark, she had driven back to the Pearl Street address and several people were on the porch, including Brown, Gervin, and Jones. B.M. arrived later. Clark testified that Brown was upset with Anna. When Anna showed up at the address that morning, Clark stated that Anna was accompanied by Carly Alexander, Andrew White, and Destiny Thomas. Clark explained that shortly after Anna arrived Anna and Brown got into a fight. She added that during the fight Thomas and Alexander both got hit and that Jones and Gervin were the ones who

hit them, but she could not remember who hit which person. Clark stated that after the fight ended Anna and her friends left. Later on, Clark testified that Brown, B.M., Gervin, and Jones left in Brown's white Dodge Neon.

**{¶70}** Clark stated that she saw Gervin with a gun that night. She described it as "a black gun with a beam on it."[3] *Id.* at p. 403.

**{¶71}** On cross-examination, Clark testified that she had known Brown for nine years. She described their relationship as friendly, but added that they were not on the best of terms on May 30 and May 31, 2015. Clark explained that Mikayla Smith owned the house on Pearl Street, but said that she and several others stayed there, including Quinton Anderson and Jones, occasionally. She stated that she and Jones were in a sexual relationship at the time of the fires. She added that she had only known him for about a month and a half before May 2015. Clark testified that she has known B.M. for about four or five years and that they are very close friends. She stated that she only really knew of Anna and Gervin from the streets, although she admitted that Gervin was around as much as Jones once she and Jones began their relationship.

**{¶72}** Clark testified that she was mad with Brown because she believed Brown was having a sexual relationship with Jones, when in fact Clark learned that Brown was with Gervin. When she got back to the house after going to the Bottom's

---

[3] She later clarified that "beam" meant a laser sight.

Up, Clark explained that Brown was irate because Brown said Anna spit on her over a pair of shoes. During this time, she overheard Brown say "I got spit on and I want to shoot this bitch[.]" *Id.* at p. 410. She also testified that she heard Jones say something similar to "I'll take care of it," but could not remember his exact words.

{¶73} Clark stated that she never saw Gervin hit Anna during the fight at the house. She reiterated that Gervin was the person in possession of the gun. She indicated that Gervin kept it tucked into his waist. She added that she had never seen Jones with a gun.

{¶74} On re-direct-examination, Clark stated that no one involved in this case considers her a friend anymore because she testified. After this answer, the court asked Clark a series of questions that were suggested by the jury.

{¶75} On re-cross-examination, Clark clarified that Brown said "I want to shoot that bitch" before Anna came over to the house.

{¶76} Sabreena Brown was the next witness to testify on behalf of the State. Brown testified that she knew Gervin and that his nickname was Buddha. She also stated that she knew Jones and his nickname, Coco. She testified that after meeting Gervin the two engaged in a sexual relationship. Brown stated that she and Anna used to be friends back when the two were in school.

{¶77} Brown said that Anna grew mad with her when she threw a pair of shoes that were in her car into the trash. Brown believed that the shoes belonged to Clark, when they, in fact, belonged to Anna.

{¶78} Brown said that she was with Gervin at approximately 3:00 p.m. on May 30, 2015. She explained that she picked Gervin and B.M. up and then went to Buffalo Wild Wings for food. The trio eventually went over to the house on Pearl Street and stayed there until it was time to go to the bar. She stated that she, Jones, and Gervin went to the bar at approximately 12:30 a.m. Brown testified that they took her car, a white 2002 Dodge Neon with Georgia plates, to the bar. She explained that the car belonged to her son's father who bought her the car when she lived in Georgia.

{¶79} Brown testified that she stayed at the bar until it closed and then returned to her car and waited for Jones and Gervin. While she was sitting in her car, she stated Anna walked past and spit in her face.[4] She explained that she got out of her car started yelling at Anna until the police came and asked if there was a problem. Brown told the officer that there was no problem and then went back to her car. Once Jones and Gervin returned, she stated that they went back to Pearl Street.

---

[4] She initially did not know who spit in her face, but then realized it was Anna.

{¶80} Brown explained that she saw Anna posted on Facebook where Anna was talking trash, bragging about spitting in Brown's face, and tagged Brown in the post. Brown stated that this made her angry and, when Anna showed up, Brown said let her in so that she could fight Anna.

{¶81} Brown testified that they all remained at the house for about 30 minutes after Anna and her friends had left. Then, she explained that she, B.M., Jones, and Gervin got into her car and left. She stated that later on Jones and Gervin asked her if she was with "the cause." Brown testified that Jones was driving while she was behind him in back seat next to Gervin who sat behind B.M. who was in the front passenger seat.

{¶82} Brown stated that they first stopped at Certified, where Jones purchased gas, oil, and a bottle of water.[5] While in the car, Brown testified that Gervin asked her if there was any tape in the car and she handed him some red tape that she had purchased to cover her broken brake light. Brown identified State's Exhibit 30, which was the red duct tape she gave to Gervin, and it was eventually admitted into evidence. Brown explained that she watched Gervin tape the oil container and the water bottle together and indicated how he did it. She did not recall if she witnessed Gervin use a shirt that was in her car. She added that Gervin

---

[5] She also testified that the group stopped at a Duke gas station, but there was never any testimony as to when they stopped at this station.

had a gun on his lap and said that Jones did not have a gun that night. She also remembered that Jones was wearing a white shirt that evening.

{¶83} Brown testified that after they left Certified they drove by 412 East Farming Street, where Anna's grandparents lived. She explained that Jones parked the car near Farming Street, but not on Farming Street. At that time, she stated that Jones and Gervin got out of the car. Although she did not remember seeing Gervin get out with his gun on him, she did not recall a gun in the car once Gervin left the vehicle. She also remembered that the oil container was no longer in the car.

{¶84} Brown explained that while she and B.M. waited in the car they heard gunshots, approximately four to six, nearby. She believed that they shot up Anna's grandparents' house. She testified that Jones and Gervin returned to the car in a fast walk, but not quite a run. Jones got back behind the wheel, and Gervin got in the back seat next to Brown, and then they left.

{¶85} She testified that the foursome traveled to Fahey Street. Brown stated that once they arrived, Jones parked the car and he and Gervin exited the car. She added that after the men got out of the car she moved to the driver's seat. Brown testified that she drove around the block a few times until she heard approximately three gunshots. Soon after the gunshots, Brown explained that Jones and Gervin got into the back seat of the car and they left. Once Jones got back into the car, Brown remembered that he said "that's Vic's house." *Id.* at p. 445.

{¶86} Brown testified that Gervin and Jones instructed her to drive to Blaine where she parked the car at Mike McCall's house. She identified several photographs depicting her car parked on Blaine, which were later admitted into evidence. One of the photographs depicted red duct tape that was similar to that used in the Molotov cocktail.

{¶87} After deserting the car at McCall's house, Brown explained that the foursome was picked up by one of Gervin's friends, Johnny.[6] She testified that Johnny drove a red truck/SUV. After Johnny picked them up, Brown stated that they went back to Certified where someone purchased more oil. She added that the group went back to her car on Blaine, but left the scene when they realized the police were there. Brown testified that Johnny then took them to the Travelodge. The foursome stayed at the hotel for approximately six hours and then returned to Brown's house. At one point while everyone was at the house, Jones and Johnny left and were eventually pulled over and arrested.

{¶88} Brown stated that at approximately midnight on June 1, 2015 the police busted down her door, found Gervin, and arrested him. She added that she was also taken to the police station and admitted that she lied to the police officers. She explained that she eventually told one of the detectives the truth once she was subpoenaed to testify before the grand jury. She testified that she lied at first

---

[6] She could not remember Johnny's last name.

because she was afraid of Gervin and the fact that they were in a relationship at the time. She also admitted that she had a misdemeanor conviction for theft out of Delaware County. She added that several people had called her a snitch because she testified in this case.

{¶89} On cross-examination, Brown admitted that she was heavily intoxicated, high on marijuana, and sleep deprived on May 31, 2015. But she indicated that this fact did not impair her ability to recollect the night's events. She recanted her previous testimony and stated that she did not recall Jones saying "I'll take care of it." She also stated that she was the one that told the group where Anna's grandparents lived, but claimed she did not tell Jones or Gervin to go to that house.

{¶90} Brown testified that B.M. at one point asked what was going on and B.M. was yelled at by Gervin to "shut up."

{¶91} On re-direct-examination, Brown stated that while everyone was at the Travelodge both Gervin and Jones stated that they "fucked up."

{¶92} At the conclusion of Brown's testimony, the trial was recessed for the day. At this time, the State moved to dismiss Count 9 (felonious assault). After no objection by the defense, the court dismissed Count 9.

{¶93} B.M. was the next witness to testify on behalf of the State. B.M. testified that Brown and Gervin picked her up at her house at approximately 7:00

p.m. on May 30, 2015. She stated that the trio went to Brown's house, the Travelodge, Buffalo Wild Wings, Gervin's family's house, and then the house on Pearl Street. She explained that when the rest of the group went to the bar she went back to the Travelodge.

{¶94} B.M. testified that around 2:00 a.m. on May 31, 2015 she and Anderson returned to the house on Pearl Street. Once she got there, she stated that the others had returned from the bar. She witnessed the fight break out between Anna and Brown and saw a man hit Anna, but could not remember who it was. She recalled that whoever hit Anna hit her pretty hard.

{¶95} After the fight ended, she stated that she, Brown, Jones, and Gervin left the house in Brown's white Neon. She explained that she sat in the front passenger seat while Jones drove. Gervin sat behind her and Brown was behind Jones. As they were in the car, B.M. remembered that one of the men asked her if she was with "the cause," but could not remember who asked her. She testified that the group went to Certified. She added that the inside of the car smelled of gasoline after going to Certified.

{¶96} Although she did not see what was going on in the back seat, B.M. stated that she saw red duct tape in the passenger door and handed it to Brown. B.M. added that she never saw Gervin with a gun. She testified that they drove around until they came to East Farming Street where the others said Anna lived. She

continued and said that Jones parked the car and he and Gervin exited the vehicle. She explained that the two men ran out of the car. B.M. recalled that both men were wearing white shirts. She did not remember if they were carrying anything with them when they got out of the car.

{¶97} While she and Brown were in the car waiting for Gervin and Jones to return, B.M. testified that she heard two or three gunshots. Soon after the gunshots, B.M. explained that Gervin and Jones came running back to the car and sat in the same seats as they were in before. She stated that they drove around until they approached Fahey Street and Jones parked the car and the two men got out of the car again. This time, B.M. explained that Brown moved to the driver seat.

{¶98} During this time, B.M. stated that she heard two gunshots. After the gunshots, B.M. explained that Gervin and Jones ran back to the car and got into the backseat. Once they got back into the car, B.M. added that she asked the group what was going on and someone told her to shut up. She testified that they dropped the car off at McCall's house and were picked up by Johnny in a red Ford. She stated that the group then went to one of Gervin's family member's house and then to the Travelodge where she slept for a little while.

{¶99} B.M. testified that they eventually left the Travelodge and went to a BP gas station on route 95 where Johnny got gas. She could not remember if the gas was pumped into a container or the car. She recalled that they proceeded to

drive back to Brown's car, but left once they saw police on the scene. She explained that the group had returned to Brown's car so that they could blow it up. She added that a discussion was had between a man and a woman about blowing up the car. She testified that the group decided to go back to Brown's house where everyone went to bed. She added that she left before everyone else awoke.

{¶100} On cross-examination, B.M. admitted that she was intoxicated and high on marijuana during the course of May 30 and May 31, 2015. She remembered that Jones was the man who got out of the car at Certified and purchased the gas. She added that Jones and Gervin asked Brown where Anna lived after stopping at Certified. B.M. clarified that the group drove to Fahey Street because it was near Maple Street. She also recalled that the discussion about blowing up the car involved the men asking Brown if it was okay if they blew up her car.

{¶101} Detective Matt Baldridge of the Marion Police Department was the next witness to testify on behalf of the State. Detective Baldridge testified that he was working on May 31, 2015 and was dispatched to 289 Maple Street. As part of his investigation, he stated that he drove around town to several gas stations to find a similar oil container as that found at the scene of the crime. One of the gas stations Detective Baldridge visited was Certified. He explained that he returned a few days later and obtained security footage of the person buying the oil. He added that he did the same thing at a BP gas station on Mount Vernon Avenue.

{¶102} Detective Troutman of the Marion Police Department was the next witness to testify. Detective Troutman testified that he was working on May 31, 2015 and that he responded to a call at 289/291 Maple Street. He described his duties, in regard to the investigation, as assisting in the collection of evidence. He stated that he collected a bullet out of the kitchen and another one out of a wall. He identified the bullet, which was marked as an exhibit and later admitted into evidence, and testified to it and the chain of custody. He added that he was present when Jones was arrested and stated that Jones was wearing a white t-shirt and blue shorts.

{¶103} Johnny Witten was the next witness to testify on behalf of the State. Witten testified that he got a call from someone he knew as "740" to pick 740 up at approximately 6:30 a.m. on May 31, 2015. He explained that he came to know 740 by giving 740 rides home from the bars in exchange for cash. Witten stated that he ultimately picked up a group of four people, two black males and two females, at the location 740 specified. Witten testified that he took the group to the Travelodge and then went back to his girlfriend's house.

{¶104} Witten explained that he received another call from 740 to pick 740 up from the Travelodge. He testified that he picked up 740 and the other black male and took them to an alley near Blaine. Before driving to Blaine, the other men told Witten that they needed gas and oil for their car, which was on Blaine so Witten

stopped at a gas station. Witten explained that once they got close to Blaine they saw police were there so they left. He added that he dropped the men back off at the Travelodge.

{¶105} Witten testified that he received a call from the other man later that day. He explained that while he and the other man were in his car they were pulled over by police. Witten added that the other man was arrested.

{¶106} Witten described 740 as being somewhere between 6'3" or 6'4" tall and weighed approximately 235 pounds. Witten could not tell for sure if 740 was present in the courtroom. Witten identified video footage of him at a BP gas station, which was played for the jury and later admitted into evidence. Witten added that he drove a red 2003 Ford Explorer. Witten testified that he purchased oil at the request of 740.

{¶107} On cross-examination, Witten testified that none of the four people he picked up on Blaine smelled of gasoline.

{¶108} Keven Kramer was the next witness to testify on behalf of the State. Kramer testified that he was employed by the Ohio Bureau of Criminal Investigation ("BCI") as a forensic scientist. Next, Kramer went into great detail about his prior education and experience in his area of expertise. Kramer stated that his duties were in BCI's firearms section and that he tested firearms for operability and could determine if a fired bullet and/or spent cartridge cases were fired from a particular

firearm. Kramer was then accepted as an expert in the area of firearms without any objection by the defense.

{¶109} Kramer explained the basics of how a revolver and semi-automatic pistol works, how a bullet is fired, and what happens to cause the bullet to move. He testified that one can determine whether two spent cartridges were fired from the same firearm. To do this, he explained that he looks at each cartridge under a microscope and by noticing tiny imperfections in the cartridge and lining them up with the other cartridge can determine if they were fired from the same firearm.

{¶110} Kramer identified copies of two laboratory submission sheets, which were later admitted as business records once the proper foundation was laid, relating to this case. The first sheet referred to a fired cartridge case and a fired bullet. The second sheet referred to three shell casings and two bullets. Kramer identified each item referenced in the sheets and testified as to their chain of custody within BCI.

{¶111} Kramer testified that he tested the different cartridge cases by comparing them to each other under a microscope. He determined that the four fired cartridge cases were all fired from the same firearm. He explained that he performed a similar test with the fired bullets and determined that the three bullets were all fired from the same firearm.

{¶112} Kramer stated that he was unable to determine scientifically if the bullets and cartridge cases were fired from the same firearm. However, he noted

that the bullets were the same caliber as the stamp on the cartridge cases. He averred that his conclusions were reached to a degree of scientific certainty after defense counsel had objected to Kramer's conclusions based on a lack of foundation that was sustained by the trial court. Kramer's lab reports were also admitted into evidence as business records once the foundation was laid.

**{¶113}** Detective Andrew Isom of the Marion Police Department was the next witness to testify. Detective Isom testified that he was working on May 31, 2015 and was involved in the investigation of a pair of suspected shootings/arsons located at 412 East Farming Street and 289/291 Maple Street. He explained that he was initially called in to locate the suspects' vehicle, a white Dodge Neon with Georgia license plates. He stated that he eventually located the vehicle and that the vehicle was subsequently taken to the police department to execute a search. He explained that he took photographs of the search. He identified each photograph, which were later admitted into evidence. Of note, Detective Isom testified that they found a roll of red duct tape and a partially torn white V-neck t-shirt that appeared to be soaked in something.

**{¶114}** Detective Isom testified that a few days after the car search he was involved in a traffic stop that resulted in the arrest of Jones. He stated that Jones was wearing a white t-shirt and blue shorts. He collected Jones's clothing, which

he identified at trial and it was later admitted into evidence. He also testified regarding the chain of custody for the clothes.

{¶115} After a brief cross-examination, the trial court asked a series of questions to Detective Isom, primarily regarding Jones's arrest.

{¶116} The State proceeded to recall Detective Troutman to testify. Detective Troutman testified that he collected the partially torn shirt found during the search of the white Dodge Neon. Detective Troutman identified the t-shirt and testified as to its chain of custody.

{¶117} On cross-examination, Detective Troutman testified that the torn t-shirt resembled the same fabric used as wick in the Molotov cocktails.

{¶118} After cross-examination, the trial court briefly questioned Detective Troutman about the chain of custody of the t-shirt.

{¶119} Lieutenant Chris Adkins of the Marion Police Department was the final witness to testify on behalf of the State. Lieutenant Adkins testified that he was working on May 31, 2015 and was involved in an investigation involving a crime that occurred at 289/291 Maple Street. He added that he was not involved with the investigation at 412 East Farming Street that day.

{¶120} Lieutenant Adkins testified that he returned to 289/291 Maple Street and went to 412 East Farming Street two or so days before trial to take some measurements. Specifically, he stated that he took measurements of the height of

the bullet holes and the window at 412 East Farming Street. He identified a series of photographs that he took of that location, which were later admitted into evidence.

{¶121} At this moment, a sidebar concerning whether the photographs were disclosed to the defense in an adequate time. Ultimately, the court allowed Lieutenant Adkins to testify regarding the measurements.

{¶122} Lieutenant Adkins also identified and testified about photographs he took of 289/291 Maple Street, which were later admitted into evidence. At this address, he explained that he took measurements pertaining to each bullet hole's height as well as the window near where the gunshots entered.

{¶123} Lieutenant Adkins testified that he was present when Gervin was arrested. He testified that Gervin was wearing a white t-shirt at the time. He then identified a photograph of Gervin the day of Gervin's arrest, which was later admitted into evidence. In the photograph, Gervin is seen wearing a white t-shirt. He added that Gervin measured in at 6'5" and weighed 170 pounds at the time of booking.

{¶124} On cross-examination, Lieutenant Adkins testified as to why no DNA testing or fingerprinting was done on any of the evidence in this case.

**{¶125}** At the conclusion of the prosecutor and defense's examination of Lieutenant Adkins, the trial court asked Lieutenant Adkins a series of questions that was suggested by the jury.

**{¶126}** At the conclusion of Lieutenant Adkins's testimony, the State moved to admit all of its exhibits. All of the State's exhibits were admitted into evidence except for three photographs which were never discussed by the State's witnesses. Defense counsel objected to the admission of State's Exhibit 39, which consisted of gas samples from 412 East Farming and Certified, because it was opened prior to being brought into the courtroom. The court noted the objection, but admitted it into evidence.

**{¶127}** After the admission of its exhibits, the State rested.

**{¶128}** At this time, the defense moved for an acquittal on all of the charges pursuant to Crim.R. 29. After both sides were given an opportunity to argue as to each count, the court ultimately granted the motion as to Count 7 (felonious assault), but denied the motion as to the remaining counts.

**{¶129}** The defense chose not to present any evidence and rested. Defense counsel renewed his Crim.R. 29 motion regarding the remaining counts, which was denied by the trial court. The court proceeded to instruct the jury and provided the following instruction,

> If, during the course of the trial, I said or did anything that you consider an indication of my view of the acts, you are instructed to

> disregard it. Likewise, if it appears to you that I have emphasized any portion of this instruction to favor either the State of Ohio or the Defendant, no such emphasis was intended and you are instructed to disregard it.

*Id.* at p. 695.

{¶130} After deliberating, the jury found Gervin guilty of all remaining charges, including each firearm specification.

{¶131} A sentencing hearing was held on November 25, 2015. At the hearing, the court found that some of the crimes Gervin was convicted of were allied offenses of similar import and merged. Specifically, the court found that Count 1 (improperly discharging a firearm at or into a habitation) and Count 8 (felonious assault) merged. The State elected to proceed to sentencing on Count 8. The court also found that Count 3 (aggravated arson) and Count 5 (aggravated arson) merged. The State elected to proceed on Count 3. Finally, the court found that Count 4 (aggravated arson) and Count 6 (aggravated arson) merged. The State elected to proceed to sentencing on Count 4. The court then proceeded to enter a judgment of conviction as to Counts 2, 3, 4, and 8, along with the firearm specifications as to Counts 2 and 8.

{¶132} Next, the court addressed Gervin's sentence. As to Count 2 (improperly discharging a firearm at or into a habitation), the court imposed a six-year prison sentence. The court also imposed a mandatory three-year prison sentence as a result of the firearm specification that was attached to Count 2. As to

Count 3 (aggravated arson), the court sentenced Gervin to six years in prison. As to Count 4 (aggravated arson), the court imposed a six-year prison sentence. As to Count 8 (felonious assault), the court sentenced Gervin to six years in prison. The court also sentenced Gervin to a mandatory period of three years in prison due to the firearm specification attached to Count 8.

{¶133} The court ordered that the prison terms resulting from Counts 3 and 8 would be served concurrently for a total of six years. The court did the same thing with Counts 2 and 4 for a total of six years. After determining that consecutive sentences were necessary, the court ordered that the two six-year prison terms would be served consecutively for a total of twelve years. The court found that it was statutorily bound to require the two three-year prison terms for the firearm specifications to be served consecutively to each other as well as consecutively to the terms imposed by the other Counts for an aggregate total of 18 years in prison. Finally, the court ordered that this sentence would be served concurrently to the sentence imposed in Marion County Common Pleas Case No. 15-CR-0225.

{¶134} The court informed Gervin that he would be subject to a mandatory period of five years of postrelease control upon release from prison. Gervin was given credit for 160 days served while in jail awaiting trial and sentencing. The court memorialized its decision, by way of entry, on December 1, 2015.

{¶135} Gervin filed this timely appeal, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT COMMITTED NUMEROUS ERRORS WHICH DEPRIVED APPELLANT HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND AN APPROPRIATE SENTENCE.**

*Assignment of Error No. II*

**APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.**

*Assignment of Error No. III*

**APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶136} Due to the nature of Gervin's assignments of error, we elect to address them out of order.

*Assignment of Error No. III*

{¶137} In his third assignment of error, Gervin argues that the trial court erred by entering convictions that were against the manifest weight of the evidence. We disagree.

{¶138} When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, it must review the

entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). When applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment "in exceptional case[s]" when the evidence "weighs heavily against the conviction." *Id.* at paragraph three of the syllabus.

{¶139} The trial court ultimately entered convictions on four counts: one count of improperly discharging a firearm at or into a habitation with a firearm specification; two counts of aggravated arson; and one count of felonious assault with a firearm specification.[7]

*Improperly Discharging a Firearm at or into a Habitation*

{¶140} A person is guilty of improperly discharging a firearm at or into a habitation when he knowingly discharges a firearm at or into an occupied structure that is either the permanent or temporary habitation of any individual. R.C. 2923.161(A)(1). "A person acts knowingly, regardless of purpose, when the person

---

[7] Because a "conviction" "consists of a guilty verdict *and* the imposition of a sentence or penalty[,]" our review is limited to the counts of which Gervin was sentenced. (Emphasis sic.) *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶ 12, citing *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, ¶ 135; *State v. Franks*, 8th Dist. Cuyahoga No. 103682, 2016-Ohio-5241, ¶ 18, citing *State v. Williams*, 4th Dist. Scioto No. 11CA3408, 2012–Ohio–4693, ¶ 54 and *State v. McKinney*, 10th Dist. Franklin No. 08AP–23, 2008–Ohio–6522, ¶ 39. In any event, we find that there was ample evidence to support the jury's guilty verdicts as to Gervin's other charges. Therefore, they were not against the manifest weight of the evidence.

is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "Occupied structure" is defined as, among other things, a house that is maintained as a permanent dwelling or when at any time a person is present or likely to be present in it. R.C. 2909.01(C).

**{¶141}** Gervin argues his conviction was against the manifest weight of the evidence because there was no physical evidence linking Gervin to the scene, no evidence was presented concerning the gun or gun residue, and the State's two key witnesses, Brown and B.M., were not credible.

**{¶142}** In regard to Gervin's arguments about the credibility of Brown and B.M., we note that when assessing the manifest weight of the evidence, "[i]t is well established that the * * * credibility of the witnesses [is] primarily a matter for the trier of fact." *State v. Clark*, 101 Ohio App.3d 389, 409 (8th Dist. 1995). Additionally, a reversal on manifest weight grounds is not required when inconsistencies exist in the testimony of different witnesses. *State v. Wareham*, 3d Dist. Crawford No. 3-12-11, 2013-Ohio-3191, ¶ 24, citing *State v. Humberto*, 196 Ohio App.3d 230, 2011-Ohio-3080, ¶ 11 (10th Dist.) ("The jury may take note of any inconsistencies and resolve them accordingly, believing all, part, or none of a witness's testimony."). Finally, the jurors were free to believe the testimony offered

by the State's witnesses. *See State v. Bates*, 12th Dist. Butler No. CA2009-06-174, 2010-Ohio-1723, ¶ 11, quoting *State v. Bromagen*, 12th Dist. Clermont No. CA2005-09-087, 2006-Ohio-4429, ¶ 38 ("It is well-established that '[w]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony.' "). Although Gervin did not present any conflicting evidence, the same principle applies where the State was the only party to offer witness testimony. *See State v. Pfeiffer*, 3d Dist. Seneca No. 13-15-22, 2015-Ohio-4312, ¶ 58; *State v. Saltz*, 3d Dist. Hancock No. 5-14-33, 2015-Ohio-3097, ¶ 46. In reviewing Brown and B.M.'s testimony, although there are some inconsistencies between their testimony and other witnesses, e.g., how many shots were fired, they are not so overwhelming that rational jurors could not find them credible.

**{¶143}** Next, we observe that no one testified that he or she saw Gervin shoot into the Dawson household (412 East Farming). However, "the elements of an offense may be proven by direct evidence, circumstantial evidence, or both." *State v. Rhodes*, 10th Dist. Franklin No. 04AP-50, 2005-Ohio-2293, ¶ 12, citing *State v. Flowers*, 10th Dist. Franklin No. 01AP-722, 2002 WL 287648 (Feb. 28, 2002), citing *State v. Durr*, 58 Ohio St.3d 86 (1991). "Circumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks*, 61 St.3d 259,

272 (1991), *superseded by constitutional amendment as stated in Smith*, 80 Ohio St.3d 89.

{¶144} In *Rhodes*, the Tenth District Court of Appeals found that a conviction was not against the manifest weight of the evidence when there was testimony placing the defendant at the scene and near the victim's door prior to the shooting. 2005-Ohio-2293 at ¶ 12. In another case, the Eighth District Court of Appeals affirmed a conviction for improperly discharging a firearm at or into a habitation although no firearm was ever found and no one saw the shooter. *State v. Ivey*, 8th Dist. Cuyahoga No. 80812, 2003 WL 1835513, 2003-Ohio-1825, ¶ 24. The court found the conviction did not require reversal because the victim testified about the defendant threatening to shoot up the victim's house, hearing gunshots, witnessing bullets flying through a house window, and because the actual bullets were recovered. *Id.*

{¶145} Similarly, in this case, there is strong circumstantial evidence to support the jury's decision. Brown and B.M. testified that Brown told the group where Anna's family lived. Both testified that Jones parked the car near 412 East Farming Street and that he and Gervin got out of the car. Brown testified that Gervin had a gun on him all night and had it with him in the car. Clark also stated that Gervin had a gun in his possession that night. Both Brown and B.M. stated that they heard gunshots nearby. After hearing the gunshots, Brown and B.M. explained that

they saw Jones and Gervin return to the car and then they left. B.M. described Jones and Gervin's movements as running. Thus, the testimony of Brown and B.M. placed Gervin in the area where the crime was committed, established that Gervin possessed a gun during this time and that someone fired a gun.

{¶146} Additionally, Dawson and William testified that they heard gunshots after someone broke their bedroom window. Dawson stated that the person trying to break the window was wearing a white shirt. When arrested within approximately 24 hours after the crime was committed, both Jones and Gervin were wearing white shirts.

{¶147} The physical evidence recovered at 412 East Farming also supports the jury's decision. The police officers testified that they located three spent shell casings outside of the Dawson's window and two bullets lodged in various areas of their home. Later that day, Dawson recovered a third bullet from her comforter, which she handed over to police. Kramer explained to the jury that he was able to confirm that all three bullets were fired from the same gun and that the spent casings were all fired from the same gun. He admitted that he was unable to determine if the casings and bullets were fired from the same firearm, but explained that that was scientifically impossible in this case.

{¶148} Given the evidence presented to the jury, we are unable to conclude that this was an exceptional case where the jury clearly lost its way. Accordingly,

we find that Gervin's conviction for improperly discharging a firearm at or into a habitation was not against the manifest weight of the evidence.

*Aggravated Arson*

{¶149} A person is guilty of aggravated arson if he, by means of fire or explosion, knowingly creates a substantial risk of serious physical harm to another person. R.C. 2909.02(A)(2). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). A "substantial risk" is defined as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). "The Ohio Jury Instructions emphasize the distinction between a 'strong possibility,' 'remote possibility,' and 'significant possibility' by suggesting the option of adding the words 'even a' in front of the phrase 'significant possibility.' " *State v. Wolf*, 3d Dist. Union No. 14-06-24, 2008-Ohio-1483, ¶ 24, citing 4 Ohio Jury Instructions (2003), Section 509.02(3). " '[T]he language chosen by the General Assembly contemplates three degrees of 'possibility': the highest is 'strong,' the middle is 'significant,' and the lowest is 'remote.' For this reason, the Committee added '(even a)' to the statutory definition.' " *State v. Eggeman*, 3d Dist. Van Wert No.

15-04-07, 2004-Ohio-6495, ¶ 40 (Rogers, J., concurring in part and dissenting in part), quoting 4 Ohio Jury Instructions (2003), Section 509.02(3), at comment. "Accordingly, the statutory definition of substantial risk recommended by the Ohio Jury Instructions reads: ' "a strong possibility as contrasted with a remote or even a significant possibility, that a certain result may occur or that certain circumstances may exist." ' " *Wolf* at ¶ 24, quoting *Eggeman* at ¶ 40 (Rogers, J., concurring in part and dissenting in part), quoting 4 Ohio Jury Instructions (2003), Section 509.02(3), at comment.

{¶150} "Serious physical harm to persons" is defined as:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

{¶151} Finally, in cases involving aggravated arson, we have found that "[t]he 'knowingly' element in an aggravated arson case refers to a defendant's state

of mind when he set a fire – i.e. the defendant is aware that the fire or explosion he set will probably create a substantial risk of serious physical harm. The requisite proof is not dependant [sic] upon the actual result of the fire but is based upon the risk of harm created by the defendant's actions." *Eggeman* at ¶ 14.

{¶152} Regarding Gervin's convictions for aggravated arson as to both the 412 East Farming and 289/291 Maple addresses, he makes the same arguments as he did regarding the improperly discharging a firearm at or into a habitation. Again, we note that the jury was free to believe the State's witnesses.

{¶153} Upon reviewing the record, there was ample evidence to support the jury's verdict. As stated supra, Brown and B.M. testified that Gervin was near both addresses at the time each fire was started. The victims at both residences testified that they saw a fire inside of their respective homes. Several witnesses testified that there was a significant amount of smoke at both scenes. Although no one testified about specific risks created by this fire, "[i]t is in the realm of common knowledge that a Molotov cocktail is an incendiary bomb, sometimes used in combat, which is fully capable of causing death if thrown at someone." *State v. Alcala*, 6th Dist. Sandusky No. S-11-026, 2012-Ohio-4318, ¶ 17.

{¶154} *Alcala* involved very similar facts to those here. In that case, the defendant threw a Molotov cocktail at a house window. *Id.* The evidence at trial established that resulting fire from the Molotov cocktail would have entered the

home and engulfed a person who was sleeping on the couch had the window not had a storm window, a screen, and an interior window pane. *Id.* Finally, the court found that the Molotov cocktail was thrown into the house at approximately 11:00 p.m., a time which is commonly known to be a time when people are likely asleep, which would cause them to be vulnerable to a house fire. *Id.* Thus, the defendant's conviction of aggravated arson was not against the manifest weight of the evidence.

{¶155} In this case, the evidence presented, regarding the fire at 412 East Farming, established that the Molotov cocktail would have entered into the bedroom and landed on Dawson and William's bed had there not been a storm window. This occurred at approximately 6:00 a.m., which is common knowledge to be a time when people are still sleeping.

{¶156} At trial, defense counsel argued that a Molotov cocktail made out of a plastic oil container, rather than the conventional method of using a glass bottle, did not create a substantial risk of serious physical harm since it would not break. Regarding his argument, we are guided by a similar case decided by the Eighth District Court of Appeals. *See State v. Willis*, 120 Ohio App.3d 320, 331 (8th Dist.1997). In *Willis*, the defendant's conviction for aggravated arson was affirmed where the defendant threw a plastic two-liter soft drink bottle filled with gasoline and the charred remains of paper towels into a house. *Id.* The defendant argued that his conviction should be reversed because the "firebomb" was inept because it

was common knowledge that plastic bottles were designed not to break. *Id.* The appellate court was not convinced and found that plastic bottles were not break-proof, but rather break-resistant. *Id.* Further, the defendant's argument was discounted by the fact that gasoline from the bottle leaked out onto the floor. *Id.* Finally, as to the defendant's "inept firebomb" argument, the court found that "the state has no duty to distinguish between intelligent criminal plans and imprudent criminal plans as part of proving intent to commit a criminal act." *Id.*, citing *State v. Stoudemire*, 118 Ohio App.3d 752 (8th Dist.1997). We, like the Eighth District, conclude that it was irrelevant that the Molotov cocktail used in this case was made of plastic rather than glass. Further, there was evidence presented that some of the contents of the bottle leaked onto the floor at 289/291 Maple.

{¶157} The evidence is stronger as to the fire at 289/291 Maple because the Molotov cocktail actually made it into the house. Further, there was testimony that the contents of the bottle had spread onto the floor, which Lieutenant Fitsko explained was the purpose of a Molotov cocktail. *See* Trial Tr., p. 188. It also appears from the record that this fire was more severe than the fire at 412 East Farming because the victim testified that he was unable to put the fire out with water. Again, we reiterate the inherent risk of a Molotov cocktail when thrown into an occupied home and at a time when it is common for people to be asleep.

**{¶158}** Finally, Brown testified that she saw Gervin using the red tape found in her car, which appeared to match the tape used on the Molotov cocktails, to tape something onto the oil container that Jones had purchased.

**{¶159}** Given the evidence presented to the jury, we are unable to conclude that this was an exceptional case where the jury clearly lost its way. Accordingly, we find that Gervin's convictions for aggravated arson were not against the manifest weight of the evidence.

*Felonious Assault*

**{¶160}** A person is guilty of felonious assault if he knowingly causes or attempts to cause physical harm to another by means of a deadly weapon. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). A deadly weapon is defined as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A). A firearm is defined as "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant." R.C. 2923.11(B)(1).

{¶161} Similar to his arguments regarding his convictions for improperly discharging a firearm at or into a habitation and aggravated arson, Gervin argues that Brown and B.M. were not credible and, therefore, his conviction for felonious assault was against the manifest weight of the evidence. We reiterate that the jury was free to believe the State's witnesses. Thus, reversal is not warranted based on that argument.

{¶162} Again, there was a significant amount of evidence presented to support Gervin's conviction for felonious assault. Brown and Clark testified that they saw Gervin with a gun on his person that evening, and Brown added that Gervin had the gun just prior to the gunshots she heard near 412 East Farming. Dawson testified that she awoke to the sounds of someone attempting to break through her bedroom window. She explained that she screamed after she realized what was going on and then heard gunshots. William corroborated Dawson's testimony when he said that he was awoken by the sounds of Dawson screaming, saw the fire, and then heard the gunshots. The evidence established that three shots were fired into the house and one of the bullets was retrieved from Dawson's comforter.

{¶163} Notwithstanding the above, Gervin argues that his conviction was against the manifest weight of the evidence because the State failed to show that

Dawson was the specific victim.[8]  This is not supported by the record.  Brown testified that she told Jones and Gervin that Anna's grandparents lived at 412 East Farming.  Moreover, both Dawson and William testified that the gunshots went off after Dawson screamed.  Thus, whoever fired the gun could have heard Dawson scream before pulling the trigger.  Albeit circumstantial, there was plenty of evidence to support the conclusion that Gervin attempted to harm Dawson.

{¶164} Given the evidence presented to the jury, we are unable to conclude that this was an exceptional case where the jury clearly lost its way.  Accordingly, we find that Gervin's conviction for felonious assault was not against the manifest weight of the evidence.

*Firearm Specifications*

{¶165} Finally, Gervin argues that the jury's findings as to the firearm specifications were against the manifest weight of the evidence.  A jury can find a firearm specification is present if it finds "that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender

---

[8] The jury was instructed "before you can find the Defendant guilty of Felonious Assault you must find beyond a reasonable doubt that on or about May 31, 2015, in Marion County, Ohio, the Defendant knowingly attempted to cause physical harm to Virginia Dawson by means of a deadly weapon."  Trial Tr., p. 706.  While deliberating, the jury asked whether they had to find that Dawson was the specific target as opposed to an unspecified person, and the court answered in the affirmative.  We note that R.C. 2903.11(A)(2) does not require the State to prove specific target of the assault, but rather the State has to show that the defendant "cause[d] or attempt[ed] to cause physical harm *to another* * * * by means of a deadly weapon * * *." (Emphasis added.)

possessed the firearm, or used it to facilitate the offense" and the indictment charged the same.

**{¶166}** As with regard to his convictions for the primary offenses, the jury was free to believe the testimony of the State's witnesses in regard to the firearm specifications. Specifically, the jury found that Gervin or Jones used a firearm to facilitate the offenses of improperly discharging a firearm at or into a habitation and felonious assault. Although no gun was ever recovered, there was a significant amount of testimony to support the conclusion that a gun was used in the commission of both offenses. Kramer testified that the bullets recovered from 412 East Farming were all fired from the same gun. Further, different members of law enforcement testified that they recovered spent casing cartridges from the scene at 412 East Farming. Several witnesses testified that they heard gunshots, and Brown and Clark testified that Gervin had a gun on him that night.

**{¶167}** Given the evidence presented to the jury, we are unable to conclude that this was an exceptional case where the jury clearly lost its way. Accordingly, we find that the jury's findings of two firearm specifications were not against the manifest weight of the evidence.

**{¶168}** Accordingly, we overrule Gervin's third assignment of error.

*Assignment of Error No. I*

{¶169} In his first assignment of error, Gervin argues that the trial court denied his constitutional right to a fair trial. Gervin also argues that the trial court erred by imposing consecutive sentences because of the firearm specifications. We disagree.

{¶170} Initially, we note that Gervin has improperly combined two arguments into one assignment of error. Whether a defendant was denied his constitutional right to a fair trial and whether consecutive sentences were appropriate are two separate issues, each with a different standard of review. Therefore, we will address the arguments separately.

*Right to a Fair Trial*

{¶171} Gervin argues three theories regarding how his right to a fair trial was violated. First, he argues that the trial court erred by failing to grant a mistrial because pretrial publicity made it impossible for the jury to remain impartial and when one of the potential jurors indicated that Jones had pleaded guilty to his involvement in the alleged crimes. Second, he argues that the trial court went beyond its duty as an impartial overseer when it laid a business records foundation on behalf of the State and when it asked the State's expert whether the expert's opinion was based on a reasonable degree of scientific certainty. Third, Gervin

argues that the trial court went beyond its duty as an impartial overseer when it validated one of the State's witness's testimony.[9]

*Impartial Jury*

**{¶172}** Initially, we note that Gervin did not object during voir dire and did not move for a mistrial on the basis of pretrial publicity. As a result, Gervin has waived all but plain error. *See State v. Hanning*, 5th Dist. Muskingum No. CA 92-17, 1992 WL 362579, *2 (Dec. 4, 1992), citing *State v. Long*, 53 Ohio St.2d 91 (1978). To have plain error under Crim.R. 52(B), the error must be an "obvious" defect in the trial proceedings that affected the defendant's "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id*. Further, plain error only exists where "but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 431 (1997).

**{¶173}** "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). "Whether to grant a mistrial is within the sound discretion of the trial court." *State v. Hansen*, 3d Dist. Seneca No. 13-12-42, 2013-Ohio-1735, ¶ 58.

---

[9] Because Gervin's second and third theories are related as they suggest judicial misconduct, we will later address these arguments together.

{¶174} The Sixth Amendment of the United States Constitution guarantees that "[i]n all [federal] criminal prosecutions, the accused shall enjoy the right to a * * * trial, by an impartial jury * * *." The Due Process Clause of the Fourteenth Amendment extended that protection to all defendants in state criminal prosecutions. *State v. Garvin*, 197 Ohio App.3d 453, 2011-Ohio-6617, ¶ 38 (4th Dist.), quoting *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 551, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

{¶175} "It is rare for a court to presume that a jury is prejudiced by pretrial publicity." *State v. White*, 82 Ohio St.3d 16, 21 (1998), citing *State v. Lundgren*, 73 Ohio St.3d 474, 479 (1995). "Moreover, the fact that prospective jurors have been exposed to pretrial publicity does not, in and of itself, demonstrate prejudice." *Id.* Thus, if "the record on *voir dire* establishes that prospective veniremen have been exposed to pretrial publicity but affirmed they would judge the defendant solely on the law and the evidence presented at trial, it is not error to empanel such veniremen." (Emphasis sic.) *State v. Maurer*, 15 Ohio St.3d 239, 252 (1984). "A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased." *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, ¶ 35. Finally, "A claim of juror misconduct must focus on the jurors who were actually seated and not those excused." *State v. Williams*, 79 Ohio St.3d

1, 4 (1997), citing *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed 80 (1988).

**{¶176}** In this case, the trial court and counsel for both parties did a sufficient job in addressing the issue of pretrial publicity. This is not a case where the potential jury was not examined regarding their knowledge of any pretrial publicity. Further, the jury was instructed several times that they were not to consider anything they might have read in the newspaper.

**{¶177}** Prior to the start of trial in this case, the court addressed both parties about an article that was written in the local paper that discussed the case. The court said that the article mentioned Jones pleading guilty, his possible sentence, and Gervin's other case. The court informed counsel that it would be appropriate to question the jury pool to determine who had read or seen the article. Before voir dire began, the court instructed the potential jurors that they need to be honest if there was any reason that they could not remain impartial as the defendant was entitled to an impartial jury.

**{¶178}** After the State had finished questioning the potential jurors, the court asked if anyone had a problem with the State's burden of proof. One juror indicated that he did not, but did "have a problem with the Defendant's supposed accomplice plead [sic] guilty[.]" Trial Tr., p. 42. The court proceeded to immediately instruct the potential jurors to disregard the juror's comments. Then, the court gave the

potential jurors a lengthy and in depth instruction about how they should not consider anything they may have seen in the newspaper. The court further notified the potential jurors that they would later be instructed to ignore any media coverage in the case while the trial is pending. Defense counsel then proceeded into a discussion with the potential jurors regarding the article in the newspaper.

{¶179} Gervin argues that a mistrial should have been awarded based on the statements of the potential juror, who initially brought up Jones's supposed guilty plea. During Defense counsel's examination of the potential jurors, he asked about whether anyone had seen the article. A couple of people indicated that they had read about the case in the newspaper. Defense counsel questioned those jurors (three in total), and two of the jurors answered that they would not be influenced by what was in the media. The third juror, the one who initially brought up Jones's supposed guilty plea, was unsure if he could remain impartial based on what he had read. However, this potential juror was later dismissed for cause because of a physical condition. Thus, this person was not a member of the jury that heard and deliberated the facts in this case. This is insufficient to establish juror misconduct, as a defendant must prove misconduct by a member of the sitting jury, not a potential juror that was ultimately excused. *See Williams*, 79 Ohio St.3d at 4. Therefore, there was no obvious defect in voir dire.

**{¶180}** Because we find that there was no obvious defect in voir dire, there is no need to determine if Gervin had a substantial right affected.

*Judge's Examination of Witnesses*

**{¶181}** Before addressing the merits of Gervin's argument, we note that Gervin also failed to object to the judge's questions to the various witness. Therefore, he has waived all but plain error. Thus, we will only reverse upon a showing of an obvious error that has affected Gervin's substantial rights.

**{¶182}** "One of the fundamental rights of a litigant under our judicial system is that he is entitled to a fair trial in a fair tribunal, and that fairness requires an absence of actual bias or prejudice in the trial of the case." *Knapp v. Kinsey*, 232 F.2d 458, 465 (6th Cir.1956).

> The judge should exercise self-restraint and preserve an atmosphere of impartiality. When the remarks of the judge during the course of a trial, or his manner of handling the trial, clearly indicate a hostility to one of the parties, or an unwarranted prejudgment of the merits of the case, or an alignment on the part of the Court with one of the parties for the purpose of furthering or supporting the contentions of such party, the judge indicates, whether consciously or not, a personal bias and prejudice which renders invalid any resulting judgment in favor of the party so favored.

(Citations omitted.) *Id.* at 466-467. Further, "great care must be taken by a judge to 'always be calmly judicial, dispassionate and impartial. He should sedulously avoid all appearances of advocacy * * *.' " *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir.1979), quoting *Frantz v. United States*, 62 F.2d 737, 739 (6th

Cir.1933). "At the end of a trial, although a litigant may be disappointed in the outcome, he should leave the courthouse feeling that he has been treated fairly, and that his case had been decided by a neutral and impartial arbiter." *Anderson v. Sheppard*, 856 F.2d 741, 745-746 (6th Cir.1988).

{¶183} Evid.R. 611 grants the trial court the power to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

{¶184} Evid.R. 614(B) empowers the court with the authority to interrogate any witness in an impartial manner. A court's questioning of a witness falls within the court's sole discretion. *See State v. Prokos*, 91 Ohio App.3d 39, 44 (4th Dist.1993).

{¶185} "The evident purpose of Evid.R. 614(B) is to prevent the trial judge, in questioning the witness, from conveying to a jury the judge's impression as to the credibility or lack of credibility of a witness." *State v. Armstrong*, 2d Dist. Montgomery No. 13498, 1993 WL 294834, *5 (Aug. 6, 1993). " 'In absence of any showing of bias, prejudice, or prodding of a witness to elicit partisan testimony, it will be presumed that the trial court acted with impartiality [in propounding to the witness questions from the bench] in attempting to ascertain a material fact or to

develop the truth.' " *State v. Baston*, 85 Ohio St.3d 418, 426 (1999), quoting *Jenkins v. Clark*, 7 Ohio App.3d 93, 98 (2d Dist.1982).

{¶186} In this case, Gervin argues that the trial court abandoned its role as a neutral arbiter and assumed the role of an advocate when it laid a business record foundation and an expert witness foundation on behalf of the State. He also argues that the trial court improperly validated Pickett's testimony about the two black males running from the crime scene. Although it is arguable that the judge assumed the role of an advocate, we find that it does not rise to the level of plain error.

{¶187} Before we analyze Gervin's other arguments, we want to briefly discuss the validation argument. A review of the record reveals that the trial court did not validate Pickett's testimony. Rather, the court was attempting to clarify where it was that Pickett saw the "two black males" as Pickett described them. We find no error with this questioning.

{¶188} It is important to note from the onset that this was not a bench trial, where the court is granted greater flexibility when examining witnesses. *See State v. Grad*, 9th Dist. Medina No. 10CA0003-M, 2012-Ohio-1358, ¶ 44, quoting *State v. Daugherty*, 11th Dist. Trumbull No. 2001-T-0024, 2002 WL 411105, *2 (Mar. 15, 2002). During a jury trial, courts must be careful with their questioning of witnesses because there is a potential for the jury to be prejudicially influenced by the judge's actions. *See id.*

**{¶189}** In this case, the court's involvement blurred the line between impartial overseer and advocate. First, prior to the court's examination of Rajendram, Gervin argues that the State had failed to establish a business records foundation for several exhibits, which were submission sheets from the crime scenes. Rajendram testified about the submission sheets at great lengths prior to their establishment as business records. At the conclusion of direct and cross-examination, the court asked Rajendram if the submission sheets were kept in the ordinary course of business at the State Marshal's office, if they were relied upon in the operation of that business, if she personally relied upon them, if they were prepared by someone at or near the time of the events reflected in the document, and if they were done in a routine manner. However, the State did question Rajendram about the submission sheets. Specifically, Rajendram testified that the submission sheets were created by her office after receiving the evidence and the evidence receipts.[10] Thus, it could readily be inferred by the trier-of-fact that the submission sheets were kept in the regular course of business and accurately reflected the identity of the State's samples. Further, counsel did not object to the admission of these exhibits at trial, therefore, given the overwhelming amount of incriminating evidence presented, this does not rise to the level of plain error.

---

[10] Upon a review of the record, the State established the evidence receipts as business records. *See* Trial Tr., p. 310-312.

{¶190} Second, Gervin contends that he was prejudiced by the trial court's interruption during the State's examination of Rajendram,

> Can we - - we don't have any testimony, first of all, you know - - you have an expert opinion, you don't have any testimony as to what it is she was examining that relates to this case, just two items, six items. Can we tie this to exhibits? Also get her qualified, make sure we're in agreement on that?

Trial Tr., p. 312-313. The State proceeded to ask Rajendram questions to properly qualify her as an expert in the field of analyzing ignitable fluids, and the court accepted her as an expert witness in that field. Upon review, the State had previously elicited the foundational requirements to classify Rajendram as an expert, therefore there was no error.

{¶191} Nonetheless, the judge's involvement in this case is troubling because it can give the appearance that the court is working alongside the State. It appears that the court is, in fact, giving the State instructions as to how it should present its case. This is further exacerbated by other events that occurred during the course of trial.

{¶192} The court seemingly instructed the State previously during Officer Wheeler's direct examination. Specifically, the court stated,

> The testimony would be a lot easier for the jury if you just give 'em all the photographs, ask him if all the ones you're gonna use, as [sic] him if they're a fair and accurate representation of what the scene appeared on that day, then you've laid your foundation, we can display the photograph as he's explaining the photograph instead of having the prior photograph displayed while he's explaining the next

photograph.  It would move quicker and I think it would be more understandable for the jury.

*Id.* at p. 228.

**{¶193}** Later, during Rajendram's direct examination, the court interrupted and said "Okay.  Let's - - you've identified items 1, 2, 3, 4, 5, and 6.  Can you identify them by exhibit so that the record's clear?  * * * Let's have the witness testify about this."  *Id.* at p. 316.  There were countless other times that the trial court interrupted the State's examination of other witnesses, raised objections sua sponte, and conducted its own examination of the State's witnesses.  Although most of these interruptions were most likely an attempt to clarify confusing issues, such as evidence identification for the jury and the record on appeal, the quantitative level of involvement was extreme.

**{¶194}** Even if we assume, arguendo, that the trial court's mistakes arose to an "obvious error," there is nothing to suggest that Gervin's substantial rights were affected.  Although the court went beyond its role in this case, the court instructed the jury,

> If, during the course of the trial, I said or did anything that you consider an indication of my view of the facts, you are instructed to disregard it.  Likewise, if it appears to you that I have emphasized any portion of this instruction to favor either the State of Ohio or the Defendant, no such emphasis was intended and you are instructed to disregard it.

*Id.* at p. 695. "A jury is presumed to follow the instructions, including curative instructions, given it by a trial judge." *State v. Garner*, 74 Ohio St.3d 49, 59 (1995). Further, the content of the court's questions appeared to be relatively neutral. The court did not appear to belittle any of the witnesses or question the credibility of any witness. Finally, even disregarding any evidence resulting from the court's interrogations, there was an overwhelming amount of incriminating evidence in this case as stated in more detail supra. Thus, errors resulting from the trial court's actions were rendered harmless and did not affect Gervin's substantial rights.

{¶195} Again, there is no question that in exercising its control of the proceedings the trial court maintained an *extensive* level of sua sponte personal involvement with the witnesses and counsel. There may be differing views about whether this practice unnecessarily creates potential for error and even plain error in certain circumstances. However, in this case, plain error did not occur.

*Consecutive Sentences*

{¶196} "A trial court's sentence will not be disturbed on appeal absent a defendant's showing by clear and convincing evidence that the sentence is unsupported by the record or otherwise contrary to law." *State v. Barrera*, 3d Dist. Putnam No. 12-12-01, 2012-Ohio-3196, ¶ 20. Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to

the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶197}** If a defendant is convicted of a firearm specification, then the trial court is required by law to impose a three-year prison term. R.C. 2929.14(B)(1)(a)(ii). This is to be served consecutive to any prison term imposed by the trial court on any of the defendant's other convictions. *See* R.C. 2929.14(B)(1)(b).

**{¶198}** Generally, a trial court may not impose more than one prison term for multiple firearm specifications "for felonies committed as part of the same act or transaction." R.C. 2929.14(B)(1)(b). However, R.C. 2929.14(B)(1)(g) provides an exception to this rule. It states,

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are * * * felonious assault * * *, and if the offender is convicted of or pleads guilty to a [firearm] specification * * * in connection with two or more of the felonies, the sentencing court *shall* impose on the offender the prison term specified under (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the specifications.

(Emphasis added.) R.C. 2929.14(B)(1)(g).

**{¶199}** In this case, Gervin was convicted of several offenses and two firearm specifications. One of his convictions was for felonious assault with a firearm specification. His other convictions were for aggravated arson and

-70-

improperly discharging a firearm at or into a habitation with a firearm specification. All of his convictions were felonies and one of them was of the type enumerated in R.C. 2929.14(B)(1)(g). Therefore, the trial court was required to impose two separate three-year prison terms for the firearm specifications and those terms must be consecutive to the prison terms imposed for the underlying offenses.

{¶200} Accordingly, we overrule Gervin's first assignment of error.

*Assignment of Error No. II*

{¶201} In his second assignment of error, Gervin argues that he was denied effective assistance of counsel. Specifically, Gervin argues that trial counsel failed to move for a mistrial during voir dire; failed to object to Lieutenant Neuenschwander's opinion testimony; failed to object to a lack of chain of evidence regarding the items shipped from the city fire department to the State Marshal's office; and failed to object to B.M.'s testimony that there was a plan to blow up Brown's car. We disagree.

{¶202} An ineffective assistance of counsel claim requires proof that trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial

would have been different." *Id.* at paragraph three of the syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *State v. Waddy*, 63 Ohio St.3d 424, 433 (1992), *superseded by constitutional amendment on other grounds as recognized by State v. Smith*, 80 Ohio St.3d 89, 103 (1997).

{¶203} Further, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance. *State v. Barnett*, 3d Dist. Logan No. 8-12-09, 2013-Ohio-2496, ¶ 45. "Ineffective assistance does not exist merely because counsel failed 'to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it.' " *Id.*, quoting *Smith v. Murray*, 477 U.S. 527, 535, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986).

{¶204} The Supreme Court of Ohio has "consistently declined 'to second-guess trial strategy decisions' or impose 'hindsight views about how current counsel might have voir dired the jury differently.' " *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 63, quoting *State v. Mason*, 82 Ohio St.3d 144, 157 (1998).

{¶205} Evid.R. 701 provides that a non-expert witness's "testimony in the form of opinions * * * is limited to those opinions * * * which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue." Thus, the Supreme Court of Ohio has found that a police officer may give his or her opinion as to the

similarity of footprints found at the crime scene with that of the defendant's shoes. *See State v. Jells*, 53 Ohio St.3d 22, 29 (1990) ("Thus, a lay witness may be permitted to express his or her opinion as to the similarity of footprints if it can be shown that his or her conclusions are based on measurements or peculiarities in the prints that are readily recognizable and within the capabilities of a lay witness to observe."). In other words, if the objects are sufficiently distinct that no scientific analysis is required, then the lay witness may testify as to his or her opinion regarding it. *See id.*

{¶206} The State has the burden of establishing a proper chain of custody for items of evidence that it offers at trial. *State v. Brown*, 107 Ohio App.3d 194, 200 (3d Dist.1995). Carrying this burden implicates Evid.R. 901, which provides that "[t]he requirement of authentication or identification * * * is satisfied by evidence to support a finding that the matter in question is what its proponent claims." Based on the "low threshold" embodied in Evid.R. 901, *State v. Norman*, 4th Dist. Nos. 08CA3059, 08CA3066, 2009–Ohio–5458, ¶ 68, the State is not required to prove "a strict chain of custody[.]" *State v. Wilkins*, 64 Ohio St.2d 382, 389 (1980). Rather, the State merely needs to "establish that it is reasonably certain that substitution, alteration or tampering did not occur." *Brown* at 200. Accordingly, "any breaks in the chain of custody after establishment of such a reasonable

certainty go to the weight of the evidence [and not] its admissibility." *State v. Plotts*, 3d Dist. No. 15–10–08, 2011–Ohio–900, ¶ 26.

**{¶207}** Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is not admissible unless one of several exceptions apply. Evid.R. 802. Evid.R. 803 provides several exceptions to the hearsay rule, including "a statement of the declarant's then existing state of mind * * * (such as intent, plan, motive, [and] design * * *) * * *." Evid.R. 803(3).

**{¶208}** Finally, relevant evidence "may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B).

**{¶209}** Upon a review of the record, we conclude that trial counsel's performance did not fall below an objectionable standard of reasonable representation.

**{¶210}** First, Gervin argues that trial counsel should have moved for a mistrial during voir dire after one of the prospective jurors stated that Jones had pleaded guilty as to his role in the crimes. This fact, according to Gervin, would be impossible for the ultimate jurors to disregard, and, therefore, Gervin was denied effective assistance of counsel.

{¶211} As stated in more detail supra, the potentially problematic juror, as well as the rest of the jury pool, was properly instructed at length by the trial court. Further, trial counsel spoke about the trial court's instruction at great length during voir dire in an attempt to further dissipate any remaining questions as to whether the jury could consider the information regarding Jones's case. Finally, the prospective juror responsible for this information was ultimately dismissed due to a physical condition.

{¶212} Second, Gervin argues that trial counsel should have objected to three evidentiary issues that occurred at trial; (1) Lieutenant Neuenschwander's opinion testimony; (2) lack of chain of evidence; and (3) the plan to blow up the car.

{¶213} At trial, Lieutenant Neuenschwander testified that it was his opinion that the fires at 412 East Farming and 289/291 Maple were similar. This was based on his observations of the scenes and the fact that a similar type of item was used to create the fire – a Molotov cocktail made out of a plastic oil container wrapped in red duct tape. Photographs were taken of both Molotov cocktails and shown to the jury. The nature of both Molotov cocktails was apparent and did not require any scientific analysis to determine that they were nearly identical. Thus, this evidence was properly admitted and a failure to object was not an error.

{¶214} Gervin's main issue with the chain of custody evidence is that no one from The Door Guys testified regarding the items they received from the fire

department and later delivered to the state Fire Marshal's office. Other than testimony from The Door Guys, everyone else in the chain of custody testified at trial. Although the State did not offer evidence as to this missing link in the chain of custody, the jury was free to determine for itself whether the items being offered into evidence were what the State claimed them to be, and there was no evidence suggesting otherwise. Thus, the State provided sufficient evidence to establish the chain of custody, and, therefore, trial counsel did not error by failing to make an objection.

{¶215} Regarding B.M.'s statements about the plan to blow up the car, the statements of the other individuals were clearly hearsay. That being said, the statements fall squarely within Evid.R. 803(3) because they go to the declarant's intent, plan, motive, and design. The individuals involved were discussing a *plan* to blow up the car to get rid of evidence. Further, this evidence was not unfairly prejudicial as to require exclusion under Evid.R. 403(B) when one considers the overwhelming evidence of guilt in this case. Thus, this evidence was properly admitted, and trial counsel did not err by failing to object.

{¶216} Accordingly, we overrule Gervin's second assignment of error.

**{¶217}** Having found no error prejudicial to the appellant, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**